C. H. POWELL CO., INC. (DOUREDOURE BROS.) *v.* UNITED STATES

No. 4685.—Invoice dated Piraeus, Greece, February 9, 1938.
Entered at New York March 4, 1938.
Entry No. 824356.

(Decided November 21, 1939)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.

*Webster J. Oliver,* Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

DALLINGER, Judge: This appeal to reappraisement involves the question of the dutiable value of 100 drums imported from Greece filled with olive oil and entered at the port of New York on March 4, 1938. The value of the olive oil is not here in controversy, the sole question at issue being the proper dutiable value of the drums as separate entities and as such classified under the provisions of paragraph 328 of the Tariff Act of 1930. Originally these drums were entered at 300 drachmas each, but subsequently, by amendment, they were entered at 160 drachmas each as second-hand drums. They were appraised as new drums at the foreign value of 300 drachmas each.

The plaintiff offered in evidence the testimony of three witnesses. The first, Bernard Douredoure, the owner of the plaintiff corporation, testified that he purchased the drums in question from the firm of Iss. Hadji Thomas. Asked by counsel whether he had any evidence to establish the market value of said drums in Greece on the date of exportation, he submitted an affidavit signed by the seller which was admitted in evidence as Exhibit 1.

In this affidavit the affiant states that for 16 years he had been a wholesale dealer in olive oil in Piraeus, Greece; that as such he had had occasion to purchase at wholesale so-called "one time shipper" olive-oil drums, both new and second hand; that Piraeus is the principal market in Greece for such merchandise; that the usual wholesale quantity consists of from 100 to 500 drums; that the 100 "one time shipper" drums herein were purchased by him at a price of 300 drachmas each, which was the price at which various wholesale dealers in Piraeus were freely offering such items for sale in the usual wholesale quantities; that in February, 1938, uncleaned, once used "one time shipper" olive-oil drums were sold and freely offered for sale to said affiant in the usual wholesale quantities by various dealers in Piraeus at the price of 160 drachmas each; that in said month, cleaned, once used "one time shipper" olive-oil drums were sold and freely offered for sale to him by various dealers in Piraeus in the usual wholesale quantities at the price of 180 drachmas each, and that the only difference between a cleaned and an uncleaned one-time-shipper drum was that the former had been washed to remove any oil that might remain in the drum after being used.

The witness then testified that the phrase "one time shipper" is used to describe a light-gauge drum as distinguished from a heavy thick drum which is more durable and therefore more expensive; that the drums at bar were "one time shipper" drums; that the olive

oil contained therein was sold to the Arlington Mills, Lawrence, Mass.; and that the drums were sold by the witness in the same condition as imported.

On cross-examination this witness testified that the type of drum known as "one time shipper" is the only type that is ordinarily used for shipping olive oil; that nothing was done to the drums before they were shipped to the Arlington Mills; that the oil was denatured before it was shipped, in accordance with the regulations of the Treasury Department; that the witness did not see the particular drums of oil at the time they were imported nor at any other time; and that of the 100 drums imported, only 98 were shipped to Lawrence, the other 2 having been imported empty.

The second witness, Charles E. Egan, proprietor of the Charles E. Egan Co., weighmasters and surveyors of bulky cargoes, testified that he handled from 70 to 80 per centum of all of the commercial olive oil imported at New York; that commercial olive oil is denatured in order to render it unfit for human consumption; that he examined the drums involved herein on March 8, 1938, on the pier at Jersey City; that he found them to be once-used drums; that two of said drums were empty and that one was broken on the side and leaking; that there were marked upon each drum the words "Latour Brand," the number, the country of origin, and the country of origin of the oil; that 97 of the 100 drums were tight; that he had extensively handled once used or "one time shipper" drums and that by that term he meant lightweight drums that had been used once.

On cross-examination he testified that although he examined 20,000 drums a year, nevertheless he could recall the condition of the particular drums herein because he had consulted his memorandum; that there was nothing unusual about the drums in this shipment, and that in his opinion this was the first time these particular drums had been used as there was new paint on them.

The Government offered in evidence the testimony of two witnesses. The first, William F. Mackenzie, examiner of merchandise at the port of New York for the past 30 years, testified that he had been examining importations of olive oil in drums for the last 10 or 11 years; that in connection with his duties he had kept a record from day to day of importations of olive oil in drums; and that in this record the importation at bar is No. 188.

The record in question, so far as it relates to the instant merchandise, was then admitted in evidence as Exhibit 2.

The witness then explained that the first column refers to the place at which the merchandise was consulated; that under the second column is given the consular number; that the third column shows the entry number; the fourth column, the number of drums in the

shipment; the fifth column, the invoice price per drum; and the sixth column, the date of exportation.

The second witness, John Kelly, sampler, class 6, in the Customs Service for the last 31 years and now retired, testified that it was part of his duty to sample importations of olive oil and that the report on the yellow slip which was admitted in evidence as Exhibit 3 was in his own handwriting. This report shows that the witness examined the imported drums containing the olive oil on March 10, 1938, and after giving the dimensions of the drums the report states that the drums were new and were made in Germany, not galvanized, but having painted ends.

On cross-examination the witness testified that the words "ends painted" in his report means that the ends were painted and not galvanized; that there were stenciled on each drum a shipping number, the name of the brand, and the country of origin; that the drums were new because they were in good condition, there being no evidence of leakage or having been knocked about or banged up, and that the drums were new in Greece at the time of exportation but of course had been used as containers for olive oil when they arrived in this country.

The plaintiff called in rebuttal one Michael Scorelle, an import agent and local commission merchant, who testified that he handled quantities of new and also second-hand oil drums in Europe for the last 25 years; that when he went to purchase new drums he expected to find them absolutely clean, without any mark on them except a mark showing the country where they were manufactured; that any other mark would show that they were not new, and that if he found the name of a brand of oil or a number painted on the drum, he would assume that they already had been sold but had been turned down by the purchaser for some reason.

Upon this record I find the following facts:

1. The merchandise herein consists of certain cylindrical drums containing olive oil imported from Greece.

2. That the drums were invoiced at 300 drachmas each, which was the price paid for them by the importer.

3. That this was the first time that these drums were used for the importation of olive oil or any other merchandise.

4. That 300 drachmas each was the price at which identical new drums were sold and freely offered for sale both for home consumption and for export to the United States in the usual wholesale quantities in Greece at the time of exportation of the within merchandise.

5. That similar uncleaned, once used drums were sold and freely offered for sale in the usual wholesale quantities for home consumption in Greece at the time of exportation at the price of 160 drachmas each.

6. That similar cleaned, once used drums were sold and freely offered for sale in the usual wholesale quantities in Greece at the time of exportation to the United States of the instant merchandise at a price of 180 drachmas each.

Upon these facts counsel for the plaintiff in their brief filed herein contend that the drums in the instant case lost their identity as new drums and became second-hand the instant they were filled with the olive oil and properly marked. In support of this contention, counsel cites various cases holding that imported merchandise should be appraised in its imported condition, with which view I fully agree, but as I read the record an accurate description of the condition in which the olive oil has been imported herein is that it arrived in 100 new drums, as clearly stated in the invoice, the cost of said 100 new drums being also correctly stated in the invoice as 300 drachmas each. It is uncontradicted that the drums were new drums at the time they were purchased by the plaintiff herein; that he paid 300 drachmas each for them, and that they were new when they were filled with olive oil both at the time of exportation and importation.

If the drums had been transported empty to this country at the time of purchase, they would be new drums upon their arrival in the United States and the mere fact that they were transported filled with olive oil made no difference in the character of the drums.

A similar question arose in the case of *F. Zito Scalici* v. *United States*, reappraisement circular 27536. That case involved the question of the proper dutiable value of certain lemon boxes which were appraised as new boxes but were claimed by the importer to be second-hand boxes and therefore entitled to a lower value. In sustaining the appraisement the court said:

The question of fact is not in serious dispute. The manner of shipping boxes filled with lemons is to obtain from a manufactory a new box, fill it with lemons, and after being addressed it is ready for shipment. The importer contends that the moment the new box is filled with lemons it has lost its character as a new box, and becomes second hand, or an old box, notwithstanding it has not been moved from the packing house. Affidavits have been offered by numerous manufacturers and shippers in Italy that the moment a new box is filled with lemons it deteriorates in value from 30 to 33 percent, and this being the fact the importer contends that upon appraisement the value should be that of an old and not a new box.

\* \* \* \* \* \* \*

Paragraph 172 provides: "Boxes, barrels, or other articles containing oranges, lemons, limes, grapefruit, shaddock, or pomoles, 15 per centum ad valorem." This portion of the paragraph does not indicate the character of the boxes, or the nature of their manufacture. It provides that boxes containing lemons are dutiable at a certain rate. \* \* \*

The record does not state clearly that the boxes were new on the date of shipment, but from the manner of doing business, and the concessions made at the hearing, I am justified in finding that all the lemon boxes, leaving Palermo were purchased as new boxes, and in that condition filled. They then became boxes containing lemons within the terms of the statute and dutiable at the value of the date of exportation. \* \* \*

The rule was enunciated in Lawder *v.* Stone, collector, 187 U. S. 281, that in arriving at the value of the merchandise you are to take into consideration its condition on its arrival in this country and then find its value in that condition in the country of and at the date of exportation.

In this connection I call attention to the definition of foreign value in section 402 (c) of the Tariff Act of 1930:

The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, *packed ready for shipment to the United States.* [Italics mine.]

In the instant case it is incontrovertible that the price at which the drums in question were purchased, and at which identical drums were sold and freely offered for sale in the principal markets of Greece in the usual wholesale quantities and in the ordinary course of trade, was 300 drachmas each.

Upon all the facts and the law, I therefore find that the invoice and appraised value of 300 drachmas per drum represents the foreign and the dutiable value thereof, there being no higher export value, and that such foreign value is the value found by the appraiser. Judgment will be rendered accordingly.